UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION


UNITED STATES OF AMERICA,

        Plaintiff,

v.                                                                  Case No.  2:17-cr-31
                                                                    Hon. Paul L. Maloney

LEE EDWARD BLOMQUIST,

        Defendant.

_____/

## REPORT AND RECOMMENDATION

Defendant Lee Edward Blomquist was indicted on four counts related to the alleged

distribution and manufacture of over 100 marijuana plants.  Defendant filed a motion to suppress

evidence seized during an April 4, 2017, search of property owned by Defendant's father, Norman

R. Blomquist, and adjoining property own by Defendant's cousin, John A. Blomquist.  (ECF No.

27).  The government filed a response.  (ECF No. 31).  A hearing was held on April 18, 2018.

Defendant filed a post-hearing supplemental brief on the issue of consent.  (ECF No. 39).  The

government filed a post-hearing supplemental response.  (ECF No. 40).

In March of 2017, a Kingsford - Iron Mountain - Norway - Dickinson (KIND) drug

enforcement team conducted three controlled marijuana buys between a confidential informant

and Clifford Lautzenheiser in the parking lot of the Iron Mountain, Michigan, Walmart Store.  On

each occasion, Lautzenheiser was observed leaving his place of employment and traveling to the

residence of Norman Blomquist in Felch, Michigan.  Lautzenheiser was observed entering the

residence, exiting the residence and placing something in the trunk of his car, and then proceeding

to the Walmart store.  KIND detectives set up a final controlled buy on April 4, 2017, which

resulted in Lautzenheiser's arrest.  KIND detectives obtained anticipatory search warrants for Lautzenheiser's vehicle and Norman Blomquist's residence.  Lautzenheiser's vehicle was pulled over soon after he had stopped at Norman Blomquist's residence, but before he arrived at Walmart to complete the marijuana sale.   Lautzenheiser admitted that he intended to sell four ounces of marijuana and had paid Lee Blomquist, his weekly supplier, $500.00 for the marijuana, but that he still owed $300.00.  Once the Lautzenheiser vehicle search revealed marijuana that appeared to originate from the Blomquist residence, the KIND Critical Incident Response Team, waiting near the Blomquist residence, moved onto the property to execute the search warrant.

As officers entered the property, Defendant was observed coming out of an outbuilding known as the "chicken coop."  Defendant was ordered onto his knees and handcuffed. He was then taken to Lieutenant Derrick Dickson and Sergeant Dumas.  After Defendant was given a *Miranda* warning, he agreed to speak with detectives.  Defendant was very cooperative and advised the detectives that his marijuana operation was legal under Michigan law.  Defendant then gave the detectives a tour of his operation.  Defendant took the detectives to the "chicken coop" and showed them over 100 marijuana plants growing inside.  Defendant took the detectives to the greenhouse where the plants would be transplanted.  Finally, Defendant took the detectives to the garage of the residence, and showed them a binder with documents he maintained to ensure he complied with Michigan medical marijuana laws.   After being asked where his processed marijuana was located, Defendant lowered a ladder that led to a locked room above the garage of the residence.   Once Defendant unlocked the door, detectives discovered 37 pounds of pre-packaged marijuana in separately labeled five-gallon buckets.  Defendant knew that he was not legally allowed to keep that volume of marijuana, but indicated that he could not just throw it

away.   Defendant admitted that he had sold marijuana to Lautzenheiser for some time, that he had sold him marijuana that day, and that Lautzenheiser had paid him $500.00, but still owed him $300.00.  Lautzenheiser is a Wisconsin resident who did not have a Michigan Medical Marijuana card.

John Blomquist, not Norman Blomquist, owns the property where the "chicken coop" and greenhouse are located.  The KIND detectives had obtained a search warrant for property owned by Norman R. Blomquist, located at N7532 Tower Road, in Felch, Michigan. Defendant and his sister, Angela Marie Pouliot, held a leasehold interest in the John A. Blomquist property.  After Defendant's sister leased the property from John A. Blomquist, Defendant entered into a sublease with his sister.  Defendant admittedly operated a medical marijuana business under Michigan law on both properties, and marijuana was found at different stages of the operation on both properties.  The KIND detectives claim that they were not aware that the property was two separate parcels.  The KIND detectives mistakenly believed that the property containing the residence and outbuildings, including the "chicken coop" and greenhouse, were all owned by Norman Blomquist and located at N7532 Tower Road.  The binder containing records found in the garage, and the 37 pounds of packaged and labeled marijuana found in the locked upstairs room above the garage, were located on Norman Blomquist's property.

In obtaining the search warrant the officers used the legal description and tax identification numbers, 003-031-023-00 and 003-031-024-00, for Norman Blomquist's property at "N7532 Tower Road, Felch MI." The warrant also includes "all outbuildings found within the curtilage."  The "chicken coop" was identified, according to Felch Township tax records, as part of Norman Blomquist's property and included in parcel 003-031-023-00, N7532  Tower Road.

3

The government argues that Defendant, who did not own the property where the marijuana operation was discovered, failed to show that he has an expectation of privacy in the property.  Alternatively, the government asserts that the search warrant was valid and that the property searched was described with particularity.  In addition, the government states that Defendant consented to the search by voluntarily providing a tour of his marijuana operation while maintaining that it was a legal operation under Michigan law.  The government also argues that the KIND detectives acted in good faith, could rely on the available public records to establish ownership of the property, and could rely upon the search warrant issued by the Dickinson County Magistrate.    Defendant states that the search warrant failed to describe John A. Blomquist's property containing the "chicken coop" and that the officers exceeded the scope of the search warrant when they entered and searched the property owned by John A. Blomquist.  Further, Defendant argues that all the evidence found on the properties must be suppressed, because the KIND detectives improperly executed a general search that was outside the scope of the search warrant.  Moreover, Defendant contends that the KIND officers knew that the search warrant did not cover John A. Blomquist's property, including the "chicken coop," because KIND detectives were familiar with both properties due to executing a search warrant in 2002 on the properties. The 2002 search warrant contained different language and described each outbuilding.

The 2002 search warrant described the property to be searched as:

The address of N-7532 Tower Road, within the Township of Felch, County of Dickinson, State of Michigan.  The property is further described as consisting of the following structures:  A 2-story white colored farmhouse; an unattached white vinyl siding & tar paper 2 car garage and attached workshop; one red barn approximately 40' x 12'; one red barn approximately 35' x 20'; one weathered barn with a partially collapsed roof approximately 60' x 100'; one white shed located approximately 15' from the rear of the 2 story

4

farmhouse; one approximate 8' x 10' tar paper shack located near the southwest corner of the 2 story farmhouse; two weathered/white storage sheds located on either side of the garden; curtilage of all of the above-mentioned buildings and approximately 1.2 acres that contain the above-mentioned buildings purportedly owned by Norman Blomquist.

(Defendant's Exhibit 5).

The 2017 search warrant and affidavit described the property to be searched as:

The real property commonly known as N7532 Tower Road in Felch, MI and owned by NORMAN R. BLOMQUIST.  Said property is further described as: Sec 31 T42N R28W, Part SW ¼-NW1/4 recorded in Liber 239 Page 951 (1.22 acre) and Liber 397 Page 981 (.36 acre), Dickinson County.  Tax I.D. numbers 003-031-023-00 and 003-031-024-00.  **See attached photographs.**

Any and all outbuildings found with the curtilage of the aforementioned address.

(ECF No. 27-1 at PageID.53).

Defendant must first show that he has a legitimate expectation of privacy in the property that was searched.  The purpose of the Fourth Amendment is to protect an individual's privacy "against certain kinds of governmental intrusion":

[1] The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and

[2] no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV; *Katz v. United States*, 389 U.S. 347, 350 (1967).  The first clause in the Fourth Amendment prohibits all "unreasonable searches and seizures" of private places.  *See Soldal v. Cook Cnty.*, 506 U.S. 56, 63, (1992); *Go-Bart Importing Co. v. United States*, 282 U.S. 344, 357 (1931).  However, the Fourth Amendment is not meant to provide a general constitutional

right to privacy. *Katz*, 389 U.S. at 351. To ensure it does not, the Supreme Court has adopted a two-part test to determine whether there is a constitutionally protected reasonable expectation of privacy under the Fourth Amendment in the area to be searched: (1) whether there is a subjective expectation of privacy in the area being searched, and (2) whether the expectation of privacy is objectively reasonable. *Smith v. Maryland*, 442 U.S. 735, 740 (1979). "Legitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." *Rakas v. Illinois*, 439 U.S. 128, 143 n. 12 (1978).

At the hearing, Angela Marie Pouliot testified that she entered into a one-year lease agreement with John Blomquist starting January 9, 2013, for the property where the "chicken coop" was located. (Defendant's Exhibit 1). The contract indicated that the property would be used to grow medical marijuana in accordance with Michigan law. She then executed a sublease of the property with Lee Edward Blomquist effective January 9, 2013. (Defendant's Exhibit 2). John Blomquist also signed the sublease. The sublease stated that it would continue after January 9, 2014, by verbal agreement. The lease agreement continued into 2017, with monthly payments made. Angela Pouliot entered into another sublease with Lee A. Tryon for the "East Greenhouse located at N7532 Tower Road, Felch, Michigan" effective June 1, 2015. (Defendant's Exhibit 3). That sublease identified John Blomquist as the landlord. The lease and subleases continued until John Blomquist asked Angela Pouliot and Defendant to vacate the property in April of 2017.

In the opinion of the undersigned, Defendant, as a lessee of the property, had a reasonable expectation of privacy in the "chicken coop" which was located on land owned by lessor John Blomquist. However, there has been no showing that Defendant had a reasonable

expectation of privacy in Norman Blomquist's property where the binder and processed marijuana were discovered in the garage of the residence.  Defendant had no leasehold interest in the Norman Blomquist property, and no subjective or reasonably objective expectation of privacy in the property owned by Norman Blomquist.  Accordingly, in the opinion of the undersigned, Defendant may challenge the search and seizure of the more than 100 growing marijuana plants discovered in the "chicken coop."  However, Defendant may not directly challenge the search and seizure of the binder found in the garage of Norman Blomquist's residence, or the 37 pounds of processed marijuana found in the room located above the garage.

Defendant argues that the property was not described with particularity and that the officers exceeded the scope of the warrant by searching the "chicken coop" and property owned by John Blomquist.  As a result, Defendant argues that the search was merely an illegal general search requiring the suppression of all the evidence discovered.  The government asserts that the officers searched only the residence and outbuildings as described with particularity in the search warrant.

A search warrant may not issue without "particularly describing the place to be searched, and the persons or things to be searched." U.S. Const. amend. IV.  However, an error in description is not automatically fatal to the validity of a search warrant.  *United States v. Pelayo-Landero*, 285 F.3d 491, 496 (6th Cir. 2002).  The test for determining whether a search warrant describes the person or premises to be searched with sufficient particularity is not whether the description is technically accurate in every detail, but rather whether the description is sufficient to enable the executing officer to locate and identify the person or premises with reasonable effort, and whether there is any reasonable probability that another person or premises might be

7

mistakenly searched.    *Id.*   Defendant is not challenging the accuracy of the search warrant, but rather argues that the officers failed to undertake a reasonable investigation to determine the boundaries of the property to be searched.  Defendant argues that when the KIND officers arrived at Norman Blomquist's property, they exceeded the scope of the search warrant by searching the "chicken coop" on John Blomquist's property.  As a result, Defendant requests that the court conclude that the KIND officers conducted an impermissible general search of the entire premise in violation of the Fourth Amendment requiring the suppression of all evidence obtained.    A general search occurs when officers search places that unreasonably exceed the scope of the warrant.  *United States of America v. Garcia*, 496 F.3d 495, 507 (6th Cir. 2007).

> The phrase "general search" embodies a specific Fourth Amendment term of art, accompanied by particular rules, policies, and remedies.  A search pursuant to a valid warrant may devolve into an invalid general search if the officers "flagrant[l]y disregard . . . the limitations of [the] search warrant." *United States v. Lambert*, 771 F.2d 83, 93 (6th Cir. 1985).  For purposes of general search analysis, we will find that an officer flagrantly disregards the limitations of a warrant only where he "exceed[s] the scope of the warrant *in the places searched*" (rather than the items seized).  See *Waller v. Georgia,* 467 U.S. 39, 43 n.3, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984) (emphasis added); see also *United States v. Decker*, 956 F.2d 773, 779 (8th Cir. 1992) ("The flagrant disregard standard applies only where the government exceeds the scope of the authorized search in terms of the places searched, and not to cases in which the government indulges in excessive seizures.").  The test for determining if the officers engaged in an impermissible general search is whether their search *unreasonably* exceeded the scope of the warrant.  *Brindley v. Best*, 192 F.3d 525, 531 (6th Cir. 1999).

*Id.* The remedy for an unlawful general search is suppression of all items seized during the search. *Id*.  Since a blanket suppression is an extraordinary remedy, it may only be used when the officers' conduct in violating the "warrants' limitations are 'extreme.'"  *Id*. (citing *United States v. Uzenski*, 434 F.3d 690, 706 (4th Cir. 2006)).

The government explains that the "chicken coop" appeared to be located within the curtilage of Norman Blomquist's property and that the property was accurately described in the search warrant by the tax identification number. In addition, the KIND detectives reasonably believed that the "chicken coop" was on Norman Blomquist's property. Defendant argues that since the officers had searched the property on a previous occasion pursuant to the 2002 warrant, they were familiar with the property and should have known that two separate parcels were included in the property actually searched.

Lieutenant Dickson testified that he obtained the property description from the Equalization Department and took photographs of the property. He used Norman Blomquist's name and fire number at "N7532 Tower Road," to obtain information on ownership of the property. The records showed that the entire property owned by Norman Blomquist, including the "chicken coop," had the same tax ID. Lieutenant Dickson testified that the property appeared to be one property, with maintained grass cut from the residence to the "chicken coop." Dickson testified that although he was present during the 2002 search of the property, he was not aware that there was an issue regarding who owned the entirety of the property. Sid Bray, from the Dickinson County Equalization Department, testified that on April 1, 2017, a law enforcement officer came to the department looking for information regarding Norman Blomquist's property at N7532 Tower Road in Felch. The department received new software, not available in April of 2017, that allowed them to obtain electronic computer photographs of the property. On May 20, 2017, the department went on-line with a GIS system that enabled users to obtain property photographs with more accurate property lines. Felch Township assessor Jim Waisanen testified that GIS is able to estimate property lines within a couple of feet. He stated that a previous assessor had made a

9

mistake regarding the property lines between the Norman Blomquist and John Blomquist property by assuming that the property south of Norman Blomquist's property was part of Norman Blomquist's property.  In fact, Norman Blomquist was paying taxes on property that he did not own.

After Plaintiff was read *Miranda* warnings he voluntarily showed KIND officers his marijuana operation, which included the growing plants in the "chicken coop" on John Blomquist's property, his business records in a binder in Norman Blomquist's garage, and the stored processed marijuana.  The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated." An officer is prohibited without a warrant from entering and searching a person's home absent consent.  *Schneckloth v. Bustamonte,* 412 U.S. 218, 219 (1973); *Illinois v. Rodriguez*, 497 U.S. 177, 186 (1990).  Consent to search must be voluntary, without coercion or the product of duress, to be valid.  *United States v. Guimond*, 116 F.3d 160, 170 (6th Cir. 1997).  It is the burden of the government to show by a preponderance of the evidence, based upon the totality of all the circumstances, that consent was voluntary.  *United States v. Mendenhall,* 446 U.S. 544 (1980).  The party "seek[ing] to rely upon consent to justify the lawfulness of a search . . . has the burden of proving that the consent was, in fact, freely and voluntarily given." Schneckloth, 412 U.S. at 222 (quoting Bumper v. North Carolina, 391 U.S. 543, 548 (1968) (quotations omitted)).  "[T]his burden require[s] 'clear and positive' proof that the consent was uncontaminated by duress, coercion, or trickery."  *United States. v. Jones*, 641 F.2d 425, 429 (6th Cir. 1981) (citations omitted).

In *Jones*, the Sixth Circuit found that the consent to search a residence was invalid due to overpowering police presence, where five police officers knocked on the door "very hard" while yelling and indicating that they had a warrant, without specifying that they had an arrest warrant for an individual not at the residence and not a search warrant. Permission to search was provided only after being told that officers had the warrant. *Id*. at 429-430. "The overpowering police presence, the kicking and banging on the door, the assertion of lawful authority, all suggest that Sarah Howard had no real choice other than to let the police search. They did not tell her that she had the right to refuse and the conduct of the police certainly suggested that no such right existed." *Id.*

Conversely, consent to search a hotel room was valid despite defendant's evasiveness, where officers dressed in tactical gear escorted the defendant to his hotel, obtained the keycard to defendant's room from the front desk clerk, failed to provide a *Miranda* warning or inform defendant of his right to withhold consent, and threatened to obtain a search warrant. *United States v. Bond*, 433 Fed. Appx. 441 (6th Cir. 2011). Initially, defendant's diversionary tactic in stating that he was in a different hotel room evidenced lack of consent, but defendant abandoned that plan. The Sixth Circuit found that consent was valid, and not the product of coercion, when defendant took the keycard from the officers and opened the hotel room door revealing a bag of marijuana on a table and by disclosing that firearms were hidden under the mattress. *Id.* The totality of the factors, in the light most favorable to the government, established that the consent to search was not the product of duress or coercion.

While it is a close question, in my opinion, even absent a finding that the warrant was valid, Defendant voluntarily consented to the search of the premises by giving the KIND

11

detectives a tour of his operation.  Defendant Blomquist was cooperative and "eager" to show the officers that his operation was legal.  Defendant showed the officers his marijuana operation after he was read *Miranda* warnings.  At some point after he was read *Miranda* warnings, but before the tour was over, officers removed Defendant's handcuffs.  There exists no evidence of police coercion, trickery, or duress which could taint Defendant's consent to search the "chicken coop" and greenhouse, or any part of his marijuana operation.  There was no testimony that Defendant was in anyway coerced.  The facts as presented at the hearing do not support a finding of coercion.  In the opinion of the undersigned, Defendant consented to the search of his entire marijuana operation located on both John Blomquist and Norman Blomquist's property.

The government argues that the search was executed in good faith and should not be suppressed under *United States v. Leon*, 468 U.S. 897, 922 (1984).  The exception does not apply when (1) the supporting affidavit contained knowing or reckless falsity, (2) the issuing judge failed to act in a neutral and detached manner and merely served as a rubber stamp for the police, (3) the affidavit lacked a sufficient basis for probable cause, or (4) the officer's reliance on the warrant was neither in good faith or objectively reasonable.  *United States v. Hammond*, 351 F.3d 765, 773-774 (6th Cir. 2003); *United States v. Abboud*, 438 F.3d 554, 578 (6th Cir. 2006).   In *Pennsylvania Board of Probation and Parole v. Scott*, 524 U.S. 357 (1998), the Supreme Court explained:

> We have emphasized repeatedly that the governments' use of evidence obtained in violation of the Fourth Amendment does not itself violate the Constitution.  Rather, a Fourth Amendment violation is "'fully accomplished'" by the illegal search or seizure, and no exclusion of evidence from a judicial or administrative proceeding can "'cure the invasion of the defendant's rights which he has already suffered.'"  The exclusionary rule is instead a judicially created means of deterring illegal searches and seizures.

As such, the rule does not "proscribe the introduction of illegally seized evidence in all proceedings or against all persons," but applies only in contexts "where its remedial objectives are thought most efficaciously served," Moreover, because the rule is prudential rather than constitutionally mandated, we have held it to be applicable only where its deterrence benefits outweigh its "substantial social costs."

*Id.* at 362-363 (citations omitted).

In *Herring v.United States*, 555 U.S. 135 (2009), the Supreme Court further explained:

The fact that a Fourth Amendment violation occurred – i.e., that a search or arrest was unreasonable – does not necessarily mean that the exclusionary rule applies. Indeed, exclusion "has always been our last resort, not our first impulse," and our precedents establish important principles that constrain application of the exclusionary rule.

First, the exclusionary rule is not an individual right and applies only where it "'result[s] in appreciable deterrence.'" We have repeatedly rejected the argument that exclusion is a necessary consequence of a Fourth Amendment violation. Instead we have focused on the efficacy of the rule in deterring Fourth Amendment violations in the future.

In addition, the benefits of deterrence must outweigh the costs. "We have never suggested that the exclusionary rule must apply in every circumstance in which it might provide marginal deterrence." "[T]o the extent that application of the exclusionary rule could provide some incremental deterrent, that possible benefit must be weighed against [its] substantial social costs."

\* \* \*

Indeed, the abuses that gave rise to the exclusionary rule featured intentional conduct that was patently unconstitutional. In *Weeks*, a foundational exclusionary rule case, the officers had broken into the defendant's home (using a key shown to them by a neighbor), confiscated incriminating papers, then returned again with a U.S. Marshal to confiscate even more. Not only did they have no search warrant, which the Court held was required, but they could not have

13

> gotten one had they tried. They were so lacking in sworn and
> particularized information that "not even an order of court would
> have justified such procedure."
>
> * * *
>
> Equally flagrant conduct was at issue in *Mapp v. Ohio*. Officers
> forced open a door to Ms. Mapp's house, kept her lawyer from
> entering, brandished what the court concluded was a false warrant,
> then forced her into handcuffs and canvassed the house for
> obscenity.
>
> * * *
>
> To trigger the exclusionary rule, police conduct must be sufficiently
> deliberate that exclusion can meaningfully deter it, and sufficiently
> culpable that such deterrence is worth the price paid by the justice
> system. As laid out in our cases, the exclusionary rule serves to deter
> deliberate, reckless, or grossly negligent conduct, or in some
> circumstances recurring or systemic negligence. The error in this
> case does not rise to that level.

*Id.* at 143-144 (citations omitted).

Where an officer in good faith mistakenly believes that an outbuilding not described in the warrant may be found within the home's curtilage, the exclusionary rule does not apply to the evidence discovered during the search. *United States v. Biles*, 100 Fed. Appx. 484, 494 (6th Cir. 2004). Similarly, the Supreme Court has found that a clerical error providing misinformation to a police officer that leads to the discovery of incriminating evidence does not require suppression of the evidence under the exclusionary rule. *Arizona v. Evans*, 514 U.S. 1(1995). In *Evans*, after a police officer pulled over defendant's vehicle, the officer discovered that defendant had an outstanding warrant for his arrest. Defendant was placed under arrest. While being handcuffed, defendant dropped a marijuana cigarette. Officers then discovered a bag of marijuana under the seat of the vehicle. After the arrest, the police learned that the arrest warrant had been

14

quashed 17 days earlier and that the arrest was unlawful.  Defendant moved to quash the fruits of

the unlawful arrest.  A court clerk failed to inform the Sheriff's Office that the arrest warrant had

been quashed.  The Supreme Court found that the police officer's reliance on the outstanding arrest

warrant, even though it was based upon the clerical error of a court employee, was in good faith

and that the exception to the exclusionary rule applied.

The search warrant obtained by KIND officers was issued to search Norman

Blomquist's property.  The KIND officers unknowingly exceeded the scope of the search warrant

when they entered John Blomquist's property and searched the "chicken coop" and greenhouse.

Despite this error, the record supports the conclusion that the officers acted reasonably and not in

flagrant disregard to the limitations imposed in the search warrant.  The officer used the tax ID

number and fire number for Norman Blomquist's property.  The tax ID number included the

"chicken coop" outbuilding.  This was a mistake, but the mistake was made years ago by a tax

assessor, who included the "chicken coop" outbuilding within Norman Blomquist's property.

Technology has now revealed this error, through satellite imaging and the GIS system, showing

that the "chicken coop" is on John Blomquist's property.  In obtaining the search warrant,

Lieutenant Dickson relied upon the inaccurate public record when describing the property to be

searched.  That reliance was reasonable under the totality of factors known to him at the time he

authored the search warrant affidavit.   KIND detectives never knew that the "chicken coop" or

greenhouse were not within the curtilage of Norman Blomquist's residence.   Nor did KIND

detectives know that the "chicken coop" or greenhouse was actually on John Blomquist's property

at the time the search warrant was executed.  It was reasonable for the detectives to rely upon the

search warrant at the time of the search, which included all outbuildings on Norman Blomquist's

property.  In the opinion of the undersigned, the exception to the exclusionary rule applies to the facts of this case.

Accordingly, it is recommended that Defendant's motion to suppress (ECF No. 27) be denied.

NOTICE TO PARTIES:  Objections to this Report and Recommendation must be served on opposing parties and filed with the Clerk of the Court within fourteen (14) days of receipt of this Report and Recommendation.  28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b); W.D. Mich. LCivR 72.3(b).  Failure to file timely objections constitutes a waiver of any further right to appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985).


 /s/ Timothy P. Greeley
TIMOTHY P. GREELEY
UNITED STATES MAGISTRATE JUDGE

Dated:   May 7, 2018